Modified.

28 C.C.P.A. (Patents)

### In re SULLIVAN.

Patent Appeal No. 4476.

Court of Customs and Patent Appeals.
June 30, 1941.

lime or other alkalies either in powder or in solution, and with or without Portland or other hydraulic cement"; that the "comminuted paper, wood pulp, rag pulp, asbestos or fibrous body is forced into the strata with water *or* a mixture of emulsified asphalt or Sodium Silicate pumped into the strata and allowed to react with an admixture of comminuted paper already containing alkalies or brine which the paper or strata may contain *and react with the Sodium Silicate. If the comminuted paper, pulp, asbestos or strata does not contain sufficient alkalies to react with the Sodium Silicate which can be shown by test beforehand,* then sufficient alkalies, such as Soda, Bi-Carbonate of Soda, Calcium Chloride or Aluminum Sulphate, etc. as already mentioned can be added to the comminuted paper, pulp or asbestos to accomplish the purpose"; that the action of the comminuted paper "is to cause a precipitation and swell and react with the other chemicals"; and that his material can be forced into the earth with either air or water. (Italics ours.)

Claims 48, 49, 53, and 60 are illustrative of the appealed claims. They read:

"48. A grouting for earth's stratas comprising a mass of comminuted organic fibrous materials and water adapted for application by pressure.

"49. In drilling wells through oil sand strata the method of preventing oil or water contained therein from leaking into the well hole which consists in introducing into the well hole a sealing medium comprising an oil vehicle and a pulpy sealing agent, and applying pressure within said hole to force the sealing medium downwardly into said hole and against the side wall thereof and into the crevices of the oil or water bearing sand strata facing on said well hole walls to seal the same against further leaks.

"53. In the drilling of well holes, the method of preventing loss of drilling fluid into openings in the well wall which consists in incorporating in the drilling fluid sugar cane fibers that have been substantially desugared, and of graded lengths within the range up to one inch, pumping the resulting composition into the well hole and to the openings in the formation to form a seal therein against the loss of fluid therethrough.

"60. In a method of treating an earth formation containing an alkaline earth metal salt brine which formation is penetrated

George P. Kimmel, of Washington, D. C. (A. Harry Crowell and Frank H. Renaud, both of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C., for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting claims 48 to 66, inclusive, in appellant's application for a patent for an alleged invention relating to a "grout" for treating the earth's strata (particularly for use in wells, such as oil wells, for sealing or blocking off crevices, etc.), and a method of using the same.

Appellant states in his application that his grout "consists of comminuted paper, rag pulp, wood pulp, asbestos or other fibrous compounds *either alone or in combination with emulsified asphalt, liquid rubber or tar or precipitating agents working in connection with Silicate of Soda;* such as, Calcium Chloride, Bi-Carbonate of Soda, Aluminum Sulphate, Sodium Chloride,

by a well bore, the step which consists in introducing into the well bore and thence into the formation rubber latex whereby the latex is coagulated on contacting the brine, forming a rubber coagulum in the brine-bearing passages of the formation."

The references are: Clapp, 1,589,512, June 22, 1926; Clapp, 1,668,760, May 8, 1928; Kirschbraun et al., 1,708,926, Apr. 9, 1929.

The references were cited against appealed claim 48.

Claims 49 to 66, inclusive, were copied by appellant from issued patents for interference purposes. Claims 49 to 52, inclusive, of which claim 49 is illustrative, were copied from the patent to McQuiston, No. 2,064,936, issued December 22, 1936, on an application filed January 14, 1935; claims 53 to 59, inclusive, of which 53 is illustrative, were copied from the patent to Parsons, No. 2,119,829, issued June 7, 1938, on an application filed May 12, 1936; and claims 60 to 66, inclusive, of which claim 60 is illustrative, were copied from the patent to Irons, No. 2,121,036, issued June 21, 1938, on an application filed October 31, 1936.

The Clapp patent, No. 1,589,512, relates to a cement asphalt composition capable of being molded or formed into sheets. The constituents in the patentee's composition are fibrous material (such as asbestos fiber, cotton fibers, chemical or mechanical wood pulp, fine sawdust or wood flour), water, asphalt, Portland cement, and sodium silicate. The patentee states that his composition may be put to a great variety of uses.

The Clapp patent, No. 1,668,760, relates to a "thermo-plastic pulp." The patentee's composition contains several constituents, such as asphalt, rosin, Montan wax, sodium silicate, water, wood flour or finely divided sawdust, China wood oil, chemical wood pulp, "mixed papers, rags, hair, rope stock, etc." The patentee's thermo-plastic material may be used for a variety of purposes, such, for example, as waterproof board.

The patent to Kirschbraun et al. relates to waterproof paper, in which an adhesive binder (such as asphaltic or bituminous material) is incorporated with paper stock, and to a process of making such paper. The patentee's composition includes "fibrous stock", emulsified asphalt, silicate of soda, aluminum sulphate, and water.

Appealed claim 48 was rejected by the Primary Examiner, as we understand his decision, on the ground that both the patent to Clapp, No. 1,668,760, and the Kirschbraun et al. patent disclose "a composition comprising comminuted paper or its equivalent, water, *silicate of soda and an agent adapted to react with the silicate of soda to form a precipitate.*" (Italics ours.) The examiner further stated in his decision that the *"silicate of soda disclosed by Clapp (1,668,760) and Kirschbraun will cause the coagulation of the composition disclosed whether placed in the soil or elsewhere. To add Portland cement to the Clapp (1,668,- 760) or Kirschbraun composition to make it hard * * * is not deemed to involve invention in view of Clapp (1,589,512)."* (Italics ours.)

In his discussion, the examiner included along with claim 48, claims 45 and 46 which, although rejected by the Board of Appeals in its original decision, were subsequently allowed by the board.

In its original decision rejecting appealed claim 48 along with claims 45, 46, and 47 (hereinafter referred to), the Board of Appeals stated that *those claims did not include* "silicate of soda or the equivalent"; that they involved "a bituminous dispersion together with other ingredients"; and that, as in the "making of roads it is a common practice to employ bituminous materials and the equivalent of bituminous dispersion," it would be obvious "to make a grouting for use on roads which involves merely a bituminous dispersion together with fibrous material and Portland cement shown by the references. These ingredients would accomplish nothing more than the usual bituminous material and cement usually employed in making roads. When roads are paved earth strata are being treated." The board accordingly held that claims 45 to 48, inclusive, were not patentable over the references of record.

In a decision in response to a request for a reconsideration of its original decision filed by counsel for appellant, the board stated that it had *"failed to note and consider claims 45 to 48 and they are now being considered.* Applicant stated in his brief that they cover a *grouting for subsoil layers* and that they should therefore be allowed over the references *which do not disclose such a grouting.* We find that only claims 45, 46 and 47 are limited in this manner, but claim 48 is not. We have carefully considered the references and are of

the view that claims 45, 46 and 47 may be allowed. *Claim 48 is still regarded unpatentable for the reasons assigned in our first decision."* (Italics not quoted.)

Claim 48 calls for a "grouting for earth's stratas comprising a mass of comminuted organic fibrous materials and water adapted for application by pressure." It does not expressly call for "a bituminous dispersion together with other ingredients," as stated by the board in its original decision, nor does it expressly call for silicate of soda to cause, as stated by the Primary Examiner, "coagulation of the composition disclosed whether placed in the soil or elsewhere."

There is no disclosure in any of the references of "a mass of comminuted organic fibrous materials and water" for use as a "grouting" for earth's strata or for any other use.

■ Each of the references discloses a composition having as an essential constituent asphalt or silicate of soda or both. We are constrained, therefore, to disagree with the reasons assigned by the tribunals of the Patent Office for the rejection of appealed claim 48.

■ Claims 49 to 52, inclusive, copied by appellant from the patent to McQuiston, relate to a method of preventing oil or water from leaking into a well hole, and call for the introduction into a well hole of "oil", paper, and water or, as stated in quoted claim 49, a "sealing medium comprising an *oil vehicle* and a pulpy sealing agent." (Italics ours.) Those claims were rejected by each of the tribunals of the Patent Office on the ground that appellant did not disclose in his application a composition or sealing medium in which "oil" is a constituent.

In its original decision, the board stated, inter alia: "Applicant argues that the emulsified asphalt or tar in his disclosure is a disclosure of oil but this is believed to be incorrect. There is a small amount of asphalt and tar present in crude petroleum but they are not generally designated an oil nor do they have the characteristic of an oil. The same is true of emulsions of asphalt or tar. It is our view that applicant's disclosure will not support these claims [49 to 52, inclusive]. Furthermore, applicant did not copy these claims within two years from the grant of the patent nor did he present claims of this character within the two years. Hence, he is clearly estopped to now obtain these claims. (Ex parte Winslow, 1924 C.D. 166; Bancel v. Meier, 1924 C.D. 302, 54 App.D.C. 257, 296 F. 1004; Hartford Empire Co. v. Coe, 452 O.G. 253, 64 App.D.C. 176, 76 F.2d 426.)"

Counsel for appellant here contend that appellant discloses in his application here involved, and in a divisional application (filed September 28, 1936, which matured into patent No. 2,138,713, November 29, 1938), the subject matter defined in claims 49 to 52, inclusive.

In his original application, here involved, appellant discloses, as one of the constituents in his grout, emulsified asphalt. Based upon that disclosure, appellant refers in his divisional application (which matured into patent No. 2,138,713) to an "aqueous dispersion of a bituminous substance" as an essential element of the composition therein disclosed, and to "emulsified asphalt" as an example of an "aqueous dispersion of a bituminous substance."

In support of their contention that emulsified asphalt should, for the purpose of this case, be considered an oil or an oil vehicle, counsel for appellant submitted two letters—one from the Standard Oil Company of Louisiana and one from the Lion Oil Refining Company.

In the letter from the Standard Oil Company of Louisiana it is stated that certain information was requested "in connection with various grades of Asphalt Oils," and that if reference was had to "Road Oils" which, it was stated, were "processed from either asphaltic base or semi-asphaltic base crudes," such oils "contain from 30% to 70% Asphalt."

In the letter from the Lion Oil Refining Company it is stated, among other things:

"We are not quite sure as to the information you desire when you ask about the 'percentage of asphalt contained in the various grades of Asphalt Oils'.

\*　　\*　　\*　　\*　　\*

"Crude oils are classified in at least two ways. The first is based upon A. P. I. gravity. The second way is based on the nature of the crude; that is, paraffinic base, mixed base, and asphaltic base crudes.

"Pennsylvania is a typical paraffin base oil; Mexican, an asphaltic base and Illinois, a typical mixed base oil."

"Asphalt" is defined in Webster's New International Dictionary as follows: 1. *Min.* A brown to black, solid bituminous substance occurring native at the Dead Sea, in Trinidad, and elsewhere (natural or native asphalt), *and also obtained as a residue from petroleum,* coal tar, lignite

tar, etc. (artificial asphalt); mineral pitch. It consists chiefly of a mixture of hydrocarbons and varies from hard and brittle to plastic forms. It is insoluble in water but soluble in gasoline. It melts on heating, and burns with a smoky flame. Asphalt is widely used for paving, roofing, paints, and varnishes. Light renders certain grades of asphalt insoluble in oil of turpentine, hence they are used in photomechanical work. Most native asphalt is a residue from evaporated petroleum." (Italics, except "Min.," ours.)

It is obvious that emulsified asphalt is not an "oil" within the ordinary meaning of that term. Nor is there anything in the patent to McQuiston to indicate that the patentee intended by the use of the terms "oil" and "oil vehicle" to include emulsified asphalt.

We are of opinion, therefore, that appellant does not disclose in his involved application a sealing medium which includes oil or an oil vehicle, as called for by appealed claims 49 to 52, inclusive. Accordingly, it is unnecessary that we consider the second ground of rejection of those claims; that is, that appellant is estopped to obtain an allowance thereof because of his failure to include such or similar claims in his application within two years after the issuance of the McQuiston patent.

■ Claims 53 to 59, inclusive, as hereinbefore noted, were copied from the Parsons patent for interference purposes. It will be observed from quoted claim 53 that the patentee used as a constituent in his sealing medium "fluid sugar cane fibers that have been substantially desugared, and of graded lengths within the range up to one inch."

There is no mention in appellant's application of the kind of fibers referred to in that group of claims, nor is there any mention in his application of any of his fibrous materials being of graded lengths. We are of opinion, therefore, that appellant is not entitled to make claims 53 to 59, inclusive.

■ Claims 60 to 66, inclusive, as hereinbefore noted, were copied from the patent to Irons for interference purposes. It will be observed that those claims, of which quoted claim 60 is illustrative, relate to a "method of treating an earth formation containing an alkaline earth metal salt brine which formation is penetrated by a well bore," and include the step of introducing into the well "rubber latex

whereby the latex is coagulated on contacting the brine."

The tribunals of the Patent Office concurred in holding that although appellant discloses in his application the use of "liquid rubber," he does not disclose the use of "rubber latex."

In its decision, the Board of Appeals said: "* * * There is a clear distinction between latex and liquid rubber. Latex is the milky juice obtained from the rubber trees whereas rubber is the coagulated milk juice or latex. The patentee [Irons] takes special pains to avoid coagulation of the latex before it is used in his method as set forth in his specification. There is clearly no disclosure in applicant's specification of employing rubber latex and hence applicant cannot make these claims."

Counsel for appellant here insist that the disclosure in appellant's application of the use of liquid rubber is a disclosure of the rubber latex called for by appealed claims 60 to 66, inclusive, and, in support of that contention, counsel have submitted several letters—one from the Monsanto Chemical Company, one from Miller Products Company, one from the United States Stoneware Company, one from United States Rubber Company, and one from Self Vulcanizing Rubber Company, Inc.

In the letter from the Monsanto Chemical Company it is stated:

"Latex is defined as a suspension of rubber globules in a watery serum. It is possible to make dispersions of coagulated, synthetic or reclaimed rubbers. These are sometimes loosely defined as latex, but a more correct term is 'dispersion'. Rubber solutions are, as the name implies, rubber dissolved in a solvent. For example, naptha solution of rubber, carbon tetrachloride solution of rubber, etc.

*"Correctly speaking, there is no such thing as liquid rubber."* (Italics ours.)

In the letter from the Miller Products Company it is stated:

"* * * Latex is not rubber. Latex with the addition of some chemicals forms a stable mixture which upon coagulation, produces rubber.

*       *       *       *       *

"You are right in presuming, that possibly the *best classification for rubber in a liquid state, is liquid rubber, or latex rubber, or rubber compound or rubber cement; not latex. As far as I know, there is no standardization as to the description of*

*rubber in a liquid state because it can be one of a thousand types, even emulsion."* (Italics not quoted.)

In the letter from the United States Stoneware Company it is stated that both in common usage and in a technical sense the term "Latex is construed to mean rubber in its natural dispersion. Raw Latex is the terminology used to designate Latex taken directly from the tree. * * * Latex is frequently compounded by rubber companies for different specific purposes. After compounding, which consists of mixing other materials with the water latex dispersion, the resulting products are generally given trade names and designations, although they are still referred to in general as Latex products, and even after these compounded Latex mixtures have been used and material processed from them, it is common to refer to these objects as being made of Latex rubber."

In the letter from the United States Rubber Company it is stated: "We have in the past used your terms 'liquid rubber' and 'rubber solution'—but the latter is confusing particularly since it implies a solution of dry rubber rather than a natural emulsion. In the synthetic field there are, of course, the two additional grades of liquid rubber which you mention, namely dispersions (from either natural rubber or reclaims) and synthetic rubber latex."

In the letter from the Self Vulcanizing Rubber Company, Inc., it is stated: "We * * * wish to advise that so far as we know there is no classification for liquid rubber other than 'Latex', or just plain 'Liquid Rubber'. It is true that the majority of liquid rubber compounds have a latex base—in other words the product is made by starting with latex, which is really the milk or sap taken direct from the rubber tree. This latex is taken from the trees, and is dried into a sheet or slab form. It is then brought back to liquid form through certain chemical treatments and the liquid latex is used as the base for the various liquid rubber compounds. * * * For instance our Airvulc Liquid Rubber is approx. 90% pure gum, with a latex base."

In the patent to Irons, the patentee states:

"Various concentrations of latex are effective. For example, rubber latex *may be used in the concentration in which it is obtained from the rubber tree, or in the more concentrated forms produced by centrifuging natural latex, or in diluted condition.*

\* \* \* \* \*

"In order to prevent spontaneous coagulation of the natural or diluted latex in shipment or during storage, it is the usual practice to add to the raw latex a relatively small amount of sodium sulphide, ammonia, or caustic soda, as these agents will preserve the latex in its natural uncoagulated condition for many months." (Italics ours.)

It is evident from the letters introduced by counsel for appellant that the term "liquid rubber" is not definite. It includes "dispersions (from either natural rubber or reclaims) and synthetic rubber latex." Although it appears from the letter of the Miller Products Company that the term "liquid rubber" is considered by that company a proper term for rubber in the liquid state, it appears from the letter from the Monsanto Chemical Company that "Correctly speaking, there is no such thing as liquid rubber," and it is stated in the letter from the Miller Products Company that "there is no standardization as to the description of rubber in a liquid state because it can be one of a thousand types, even emulsion."

The statements contained in the letters hereinbefore referred to, which were treated as evidence by the Board of Appeals, were not verified by oath, and we know of no rule in the Patent Office which permits such unverified statements to be considered as evidence. Our consideration of them in the instant case, which is due merely to the fact that they were given consideration by the Board of Appeals, should not be interpreted as a holding by this court that statements not properly verified, such as those here in question, are competent as evidence in cases of this character.

In view of the fact that it is evident from the patent to Irons that the patentee contemplated the use of natural rubber latex, that is, latex as it comes from the rubber tree, or such latex in a more concentrated form, we are in agreement with the conclusion reached by the tribunals of the Patent Office that appellant does not disclose in his application "rubber latex" or "latex," as called for by appealed claims 60 to 66, inclusive.

For the reasons stated, the decision of the Board of Appeals is modified, being reversed as to claim 48 and affirmed as to claims 49 to 66, inclusive.